*825 Statement of the Case.
MONROE, J.
Plaintiffs are grandchildren of Mrs. Evalina Gamper, who died in April, 1909, and they seek to annul an act of conveyance made by her to defendant on November 26, 1907, which reads, in part, as follows:
“Said Mrs. Evalina Gamper declared to me, notary, and witnesses, that the said Mrs. Edna S. Craig is her niece, and that during her continued and painful illness the said Edna S. Craig has devoted her entire time in nursing and caring for declarant, and for that purpose has abandoned a lucrative position, her only means of support, and she further declared that in consideration of the devoted services thus rendered to her by the said Mrs. Edna S. Craig, and in further consideration of the undertaking by Mrs. Craig, as hereinafter set out, she does hereby give to the said Mrs. Edna S. Craig, in part consideration for her devoted services, past, present and to be rendered, the following described property [describing a piece of real estate, No. 749 Dryades street, New Orleans, .worth about $1,500]. And, in addition to the said property, she hereby pays to her the sum of $1,755.59, now on deposit with Mr. Harry H. Hall of this city, authorizing him hereby to transfer and deliver the said sum tc the said Mrs. Edna S. Craig; and the said Mrs. Edna S. Craig, on her part, hereby declares that she obligates herself to devote her entire time and services to said Mrs. Evalina Gamper so long as she shall live, and to defray from said sum, or, if necessary, the above-described property, all the expenses of her illness and support, and to provide for such expense as may be rendered necessary by her death.”
The grounds of attack are: (1) That there is no estimation of the value of the services or real estate; (2) that the act conveys all the property j)ossessed by the donor, or transferrer, leaving her without means of support; (3) that the donation or transfer was not the voluntary act of the donor or transferrer; (4) that the defendant rendered no services to the decedent, or that the services were of Insignificant value. The prayer of the petition is that the act in question be annulled; that the petitioners be decreed the owners, in the proportion of one-third each, of the money and real estate purported to be therein conveyed; that they have judgment against the defendant for the rental of the real estate, at the rate of $25 per month during the time that she has retained possession of the same; and that Harry H. Hall be served with a copy of the petition, “in order that he may retain in his hands whatever balance of the said sum of cash he may now have.” The answer admits the execution of the act of conveyance sought to be annulled, and avers that decedent paid defendant the sum of $1,755.59 on deposit with Mr. Hall—
“and thereby authorized him to transfer and deliver the same to your respondent; that, while Mr. Hall was so authorized, respondent instructed him to retain said sum and to use the same for the purpose of supporting and caring for the said Mrs. Gamper during her life, and discharging her funeral expenses after her death, and that said sum has been solely and exclusively employed for those purposes, and for no other purposes; and that at the time of the death of the said Mrs. Gamper there remained of the said sum * * * only a balance of $601.84, the difference having been expended as above stated, and for taxes and other incidental and necessary expenses * * *; that the real estate * * * was likewise held by her, subject to the support and maintenance of the said Mrs. Gamper, who not only occupied a portion of the said house, but received the entire rental from the remainder thereof as long as she lived; and respondent says that she did not cause to be registered in the conveyance office the said contract, * * * until after the death of the said Mrs. E. Gamper.”
Further answering, respondent says:
“That on the 11th of January, 1905, the said Mrs. Gamper, by last will and testament, in nuncupative form, before Charles G. Rebentisch, notary public, donated to the respondent the said property known as 749 Dryades street.”
The answer then recites the services alleged to have been rendered 'by respondent to the decedent and the sacrifice thereby entailed, alleges that the property and money conveyed by the contract in question would but moderately compensate the same, and prays that plaintiffs’ demand be rejected.
It is shown beyond dispute that Mrs. Gam-per was an intelligent woman, of determined will, and no attenrpt has been made to support, by proof, the allegation of the petition that the transfer here attacked was other *827 than her voluntary act, or that she was mentally incapable of mating it. It appears that she was first married to a Mr. Hearsey, and that the three plaintiffs, Sidney, George, and Clement Hearsey, are the sole living descendants from that marriage and the sole, forced heirs of the decedent. Clement Hear-sey is married, and he and his wife keep house to themselves. Thg other two, with their mother, Mrs. Columbia Hearsey (widow of Mrs. Gamper’s deceased son), live together, as another household. The defendant is a niece, being a daughter of Mrs. Gamper’s deceased sister. After the death of her first husband, the decedent had married a Mr. Gamper, and, for some years, they lived together in this city as people in comfortable circumstances. A good many years ago, however, Gamper went to California, and his wife removed to the house No. 749 Dryades street, which appears to have belonged to him and to have been devised to her at his death (in, say, 1904), and which is described as a, “ramshackle old shanty,” and a “tumble-down old rattletrap,” dilapidated in the extreme, and situated in a dingy and undesirable neighborhood; a place where Mrs. Clement Hearsey objected to visiting; in which defendant was ashamed to have it known that she was staying; and from which all parties were ashamed that decedent should be buried. The decedent occupied the upper front room, from the walls of which the plaster had partly fallen, and rented the lower part of the house to a family at a rental of $15 per month. She kept no servant, but waited on herself, save for occasional services rendered by the wife of her tenant. If we understand the testimony correctly, she received remittances of $20 per month from her husband, which, added to the $15 per month rental, gave her a total income of $35 per month. For a number of years before her death (at which time she was about S4 years old) she suffered from some stomach or heart troubles, or perhaps both, which at times threatened to result fatally, and on such occasions her relatives and connections were summoned, and Mrs. Columbia Hearsey and defendant would spend the night with her; and they visited her at other times, and Mrs. Hearsey now and then sent her things to eat which she had cooked for her. Upon the occasion of one of the attacks, whilst calling- at Mrs. Iiearsey’s house, and perhaps on other occasions, that lady invited her to make her home there, though we do not understand that she was invited to come as a guest, since she was understood to be possessed of some means and Mrs. Hearsey had none, and her unmarried sons do not appear to have been engaged in any remunerative employment. Mr. and Mrs. Clement Hearsey rarely visited the decedent, save when summoned as stated above, and saw but little of her. The defendant was a teacher in the public schools in the parish of Jefferson, above the city of New Orleans, and on the other side of the Mississippi river, and when she visited her aunt, as she did frequently, it was necessary for her to cross the river in a skiff, a trip which she made, in answer to a summons, upon one occasion, at midnight and in a storm. About January, 1906, the defendant, finding that the condition of her aunt was getting worse, adopted the plan of spending her nights with her, going across the river on the ferry, and by rail, to Amesville, or Fortier, to her school in the mornings, and returning in the same way in the evenings, and during the summer of 1906 she gave up her summer school and remained with her aunt altogether, resuming the practice of going back and forth with the opening of the regular school in the fall, and again giving up her summer school in 1907. In the fall of 1907, she obtained leave of absence from the school authorities, and it was at this time (November 26, 1907) that *829 the conveyance here attacked was executed. Defendant says:
“They [the school directors] granted me a leave of absence until the first of January. I thought, then, that she would not live, and that I could then go back to my school.”
Her aunt, however, continued to live, and the defendant continued to stay with her, thereby sacrificing her position and her salary of $50 a month, upon which she was entirely7 dependent for her support, until April 13, 1909, when Mrs. Gamper died. Defendant’s ministrations to the decedent included everything that a relative, friend, nurse, and servant combined could do for an exacting and helpless old woman. She cooked for and waited upon her, and was called on at all hours of the day and night. She slept in the same bed with her, and got up on warm nights and built fires (for her patient, being old and much emaciated, felt chilly when others were suffocating with the heat), and made coffee. She helped her out of bed and put on her clothing, so long as she was able to sit up. She furnished her with cloths, in which to expectorate, and burned the cloths. She at times, and at night, did washing that she did not like to ask others to do. Mr. Hall testifies that Mrs. Gamper came to see him in 1904, after which he obtained some remittances for her (from the California estate of her deceased husband, as we understand), and he proceeds:
“Prom that time, Mrs. Gamper came to my office repeatedly, practically every week, for the purpose of getting from me those remittances, which were small in amount, and I became quite familiar with her condition of body and her condition of mind. ■* * While she was confined to bed by this illness, which proved fatal, I went from time to time to her room at her request. She would ask me to come and see her, and she would complain bitterly of her suffering for two years before her death, begging to be relieved from her misery. She was reduced to the worst condition of emaciation that I have ever seen in a human being. When I left here in the summer of 1906, I had not the remotest idea that she would be living when I returned in the fall. Por year after year and month after month, she appeared not to have one foot in the grave, but to be in the grave up to her neck, you might say. I never saw a human being- suffer so much and yet be so tenacious of life, despite her wish. Prom the time that she was confined to the house, I found Mrs. Craig there. * * * She stated that she did not wish to die without having made some provision for her niece, Mrs. Craig, who had devoted her life to her for 'the last two years and for some time before that, and who-had lost or given up her position in order to serve her; that it would be a very small compensation. * * * When this transfer was made, I held in my possession, for the account of Mrs. Gamper (having given to her, personally, everything else received by me), the sum specified there of $1,755.59. On the 13th of April, 1909 [the day the old lady died], * * * I had expended, for insurance and taxes, or paid solely to her or for her account, and never for the account of anybody else — except at her request having paid once or twice, I think, some small coal bills for Mrs. Hearsey — all of that amount except $601.84, which was the balance I had in my possession on April 13, 1909. Everything else has been accounted for by me. None of that money was given by me to Mrs. Craig or to anybody else except Sirs. Gamper. * * * These funds were never turned over by me to Mrs. Craig, nor was the deed to the property registered * * * until after the death of Mrs. Gamper.”
The following letter, shown to have been written by Mrs. Gamper, speaks for itself (the reproduction being literal):
“New Orleans, Dec. 3rd, 19
“Mr. Hall.
“Dear Sir: will you please transfer what money I have in your possession to my niece Edna S. Craig as God knows she richly deserves it for she sacrificed her living for me when no one else would but I rearly thought I would have had more out of what Mr. Gamper left you will please put the property in her possession as soon as possible for I feel as though I could not be here much longer I think you told me that you had paid the insurance and taxes please tell her everything that will be to her interest I would like so mutch to see-you. Your Well Wisher
“Evalina Gamper.”
From a copy, offered in evidence (and admitted, to show the condition of mind of the testatrix at the time it was made), the will referred to In the answer appears to be regular in form. It bears date January 11,. 1905, and contains the following dispositions, viz.:
“I give and bequeath, out of my estate, at my death, whether movable or immovable, real,. *831 personally (sic) and mixed, and whether located in this state or elsewhere, especially in this State and California, or any other place where may be located, any and all property I inherit or acquire by virtue of my said husband’s will or death, or by law, as follows, to wit:
“To my niece, Mrs. Edna S. Craig, the divorced wife of j. R. Greer residing in this city, a certain lot of ground, with the buildings thereon” (describing the property No. 749 Dryades street), “bequeathed to me by my said second husband, and one half of what will be coming to me from my said second husband’s estate in California or elsewhere. To Harry Ellison, living at No. 1024 Third street in this City, the sum of $100, in cash, to be taken from what will be coming to me from my said second husband’s estate in California or elsewhere. And:
“The residue of my estate, including what will be coming to me from my said second husband’s estate in California or elsewhere, I give and bequeath to my said daughter in law, Columbia D. Hearsey, and her three above named children (my grandchildren) Sidney P., George G., and Clement G. Hearsey, share and share alike. I nominate and appoint William G. Rebenlisch, of this City, to be my sole testamentary executor and detainer of my estate, with full seizin thereof and without bond,” etc.
Mr. 1-Iall further testifies that, since the death of Mrs. Gamper, “with the consent of counsel,” he has collected $15 a month as rent for the Dryades street property, for which, with the balance in his hands, already referred to, he will account “after paying the taxes or whatever necessary expenses will have to be paid for account of the property,” and there is in evidence, approved by Clement G. Hearsey, a bill of $133 for the funeral expenses of the decedent.
Opinion.
Plaintiffs’ allegations that the conveyance here attacked was not the voluntary act of the decedent, and that defendant rendered no services or that the services rendered were insignificant, have been, practically, abandoned, and the grounds of attack, set up in the petition, which are now relied on, are (1) that:
“There is no estimation of the value of tile services, rendered, or to be rendered, and no estimation of the value of the real estate conveyed ; and (2) that the act is a transfer of all the property possessed by the donor, or transfer-rer, leaving her without any means of support, and hence is absolutely null and void and vio-lative of a prohibitory law.”
The provisions of the Civil Code which appear to bear upon the question at issue are as follows:
“Art. 1468. A donation inter vivos * * * is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it.
“Art. 1493. Donations inter vivos or mortis causa can not exceed two-thirds of the property of the disposer, if he leaves, at his decease, a legitimate child; one half, if he leaves two children ; and one third, if he leaves three or a greater number. Under the name of children are included descendants of whatever degree they be, it being understood that they are only counted for the child they represent.
“Art. 1497. The donation inter vivos shall, in no case, divest the donor of all his property; he must reserve for himself enough for subsistence ; if he does not do it, the donation is null for the whole.
“Art. 1502. Any disposal of property, whether inter vivos or mortis causa, exceeding the quantum of which a person may legally dispose to the prejudice of the forced heirs, is not null, but only reducible to that quantum.
“Art. 1503. A donation inter vivos, exceeding the disposable quantum, retains all its effects during the life of the donor.
:¡: :¡s * * * * *
“Art. 1513. Remunerative donations can never be reduced below the estimated value of the services rendered.
* * :!! * * 5!: *
“Art. 1514. Donations by which charges are imposed on a donee can never be reduced below the expenses which the donee has incurred to perform them.
* * * * * * *
“Art. 1523. There are three kinds of donations inter vivos: The donation purely gratuitous, or that which is made without condition and merely from liberality; the onerous donation, or that which is burdened with charges imposed on the donee ; the remunerative donation, or that, the object of which, is to recompense for services rendered.
“Art 1524. The onerous donation is not a real donation, if the value of the object given does not manifestly exceed that of the charges imposed on the same.
“Art. 1525. The remunerative donation is not a real donation, if the value of the services to he recompensed thereby, being appreciated in *833 money, should be little inferior to that of the gift.
“Art. 152G. In consequence, the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except ■where the value of the object exceeds by one half that of the charges or of the services.
“Art. 2655. The giving in payment is an act by which a debtor gives a thing to the creditor, who is willing to receive it, in payment of the sum which is due.”
Articles 2656, 2658, and 2659 provide that giving in payment differs from a sale only in two respects: (1) That a sale is perfect by the consent of the parties, whereas giving in payment is completed only by the delivery of the thing given; and (2) that an insolvent may lawfully sell for the price paid him, whereas the law forbids the giving in payment to one creditor to the prejudice of the others of anything save money.
From which it follows that in the giving in payment, as in the contract of sale, it is essential that the price or value of the thing given be fixed and agreed on.
There is, however, no such rule with regard to donations, though, in the case of a gratuitous donation, the value of the thing given may be inquired into for the purpose of ascertaining whether or not it exceeds the disposable portion, and, in cases of conveyances, purporting to be remunerative or onerous donations, such values may be inquired into in order to determine whether they are what they purport to be, or whether they are real, or gratuitous, donations, and subject to the rules applicable thereto. In Kleinpeter, Adm’r, v. Harrigon, 21 La. Ann. 196 (upon which plaintiffs seem to rely), it was held that a transfer of real estate is null as a sale, if the act does not show that a price has been fixed and agreed on; and that a fixed price is of the essence of the contract of dation en paiement. Referring to the contract there under consideration, however, the court said:
“It is.not pretended that it is an exchange or donation inter vivos.”
We therefore conclude that the validity of the conveyance here attached, purporting, as it does, to be, at once, a remunerative, and an onerous, donation, is not affected by the failure of the parties to estimate, or fix, in exact terms, the value of the real estate conveyed or of the services rendered, or charges imposed, as the consideration of such conveyance.
In support of the allegation that the conveyance in question transferred all of the property of the donor, leaving her without means of support, the learned counsel for plaintiffs say in their brief:
“Sidney Hearsey. and Mrs. Hearsey testify that they knew of no other property left by Mrs. Gamper. Mr. Hall knew of none. There is no evidence that there is any other property remaining at the death of Mrs. Gamper. Defendants, of course, appreciate the necessity of averring and proving that the property sought to be conveyed did not constitute the entire estate of the donor. Their failure to produce evidence can be construed in only one way: They did not, because they could not. However, it fairly appears, positively, from the record made by Mrs. Gamper’s act and letter that she had nothing, or but little more, to give. (1) The letter * * * written by Mrs. Gamper to Mr. Hall expresses the writer’s regret that the property which she was to donate was not greater, in order that Mrs. Craig Greer might be more adequately compensated. (2) In the authentic act of donation, care is taken by Mrs. Gamper to provide that the property, ostensibly ceded, should be devoted to her own support; and, to insure that it would be so dedicated, she retains possession and control thereof. This indicates strongly that she had, elsewhere, no sufficient fund to accomplish the same purpose. WTe conclude, therefore, that this point is thoroughly established. We believe, however, that the burden of the proof in this case is upon the defendant to show that, in fact, the donor had other property. This is intimated in the Hagrange Case, quoted supra, * * *: ‘No proof was offered to show whether he had, at that time, any movable property whatsoever.’ ”
Sidney Hearsey was not called as a witness and gave no testimony. We assume, therefore, that counsel refer to Clement Hearsey, as having testified that he knew of no other property left by Mrs. Gamper; and. it is true that he so testified. But he did not pretend to know anything about Mrs. Gamper’s af *835 fairs; and, on his cross-examination said that, prior to Gamper’s departure for California, he was a man of means, and that he and his wife lived as people of means, in a handsome house, Mrs. Gamper keeping an open account with a livery stable, and using a carriage whenever she chose. Mrs. I-Iear-sey (the mother of Clement I-Iearsey) testified, on her examination in chief, as follows (her attention having been first called to the property and money included in the act of donation):
“Q. As a matter of fact, do you know whether or not Mrs. Gamper had any other money than that when she died? A. No, sir; I don’t know whether she had or not. Q. So far as you know, had she anything else, besides that? A. No, sir; not so far as I know. I didn’t know anything about any of her affairs.”
Mrs. Clement I-Iearsey, in answer to similar questions, said:
“No, sir; I don’t know anything about it, except that Mr. Gamper was supposed to have left her a very comfortable amount when he died, out in California. No, sir; because I never knew anything at all about her affairs, and never discussed them or asked her any questions about them.”
Mr. I-Iall having been called to the stand by counsel for plaintiff, and asked whether he could point out to the court any property or any money that belongs to the succession of Mrs. Evalina Gamper, except the real estate on Dryades street and the money in his hands, replied:
“I can state that I cannot point out anything, because there is nothing, so far as I know, within the limits of this city. The money that I received for the account of Mrs. Gamper was the result of litigation in California. I can give you, if you desire, all the information that I have on the subject of Mr. Gamper’s California estate. These are the documents which I have in my possession. If you desire me I can offer them in evidence. Q. No; I do not. A. Very well. By Mr. Titche: That is our case.”
The letter written by Mrs. Gamper to Mr. Hall bears no date, and though it indicates that, when written, Mrs. Gamper was disappointed with the amount that she had received from her husband’s estate, it is not conclusive to the effect that there was nothing more to come. Nor do we find that the obligation assumed by defendant, in consideration of the transfer to her of the money and property, as recited in the act of donation, leads to such conclusion. We therefore find that whether Mrs. Gamper had other property than that included in the donation here-attacked is left in doubt.
In the Succession of Box, 2 Rob. 292, Patrick Fox sued the succession of his brother for $3,000 bequeathed to him as a remunerative donation, for services rendered, and the-executrix defended, on the grounds, substantially, that the services rendered were insignificant and had been sufficiently compensated, and that the bequest exceeded the disposable portion of the estate, and, if sustained at all, should be reduced. The court, dealing with the question of the burden of the proof,, said:
“It is urged by Patrick Fox that, as his services have been acknowledged by the testator, and a value set upon them, it was not necessary for him to prove them; or, at least, that such strict proof should not be required as in the-case of an ordinary claim against a succession. A distinction, we think, should be made. If a remunerative donation exceed the disposable-portion, the donee or legatee is bound to prove the value of his services, and the legacy will be reduced if he does not show that his sendees are worth the amount bequeathed to him. Gn the other hand, if the value of his services be equal to, or greater than, the bequest, no reduction can be made. * * * But, whenever the remunerative disposition does not exceed the disposable portion, the declaration of the testator as to the services rendered and their value should be conclusive on the heirs, and no proof should be required from the legatee. Toullier, 190. In the latter case, the remunerative disposition should be viewed as an ordinary bequest, and the services mentioned by the testator as his motive or inducement for making-it. The record leaves us entirely uninformed as to the property left by the deceased. As the executrix has averred, in her answer, that the legacy exceeded the disposable portion, and as the petitioner was not bound to prove his services unless such was the fact, it behooved the-executrix, to show it.”
The court then goes on to say that, as there may have been doubt as to where the- *837 burden of proof rested, and as injustice might be done unless further evidence should be adduced, the ease would be remanded.
Moore et al. v. Wartelle et al., 39 La. Ann. 1070, 3 South. 384, was a suit by grandchildren to set aside a conveyance made by their grandmother to their uncles, on the ground that it was a disguised donation, made in fraud of their légitime (and upon some other grounds). Held:
“The burden was not, as contended, on the defendants, to uphold the act assailed. * * * The law * * * imposes on the complainants the burden of adducing convincing, if not irresistible, proof, to undo the act of their deceased parent,” etc.
In the instant case, though the plaintiffs are not setting up their right, as forced heirs, to have the donation here in question reduced, but are insisting that, without reference to their légitime, they are entitled, under Civ. Code, art. 1497, to have it declared null for the whole, because the donor parted with all of her property, in violation of a prohibitory law, they are as much bound to prove the fact relied on as though they were merely alleging that the donation exceeds the dis-X)osable portion, since, unless the fact be as they allege, which is not apparent on the face of the instrument, it must be presumed that the parties have acted within the law and not in violation of its prohibition, and that the donation is valid.
The leading case in which the prohibition referred to was given the interpretation on which plaintiffs rely (and which has been followed in more recent cases) is Lagrange v. Barré, 11 Rob. 302. It there appeared that the donor himself, as plaintiff, complained that the heirs of the donee had failed to comply with the condition upon which the donation had been made, and which was (translating from the French) that the donee should provide the donor with food, lodging, fire, and light during his life, and that he (the donee) and his servants should give to donor all the care that children should give to their father, and, in the event of his falling sick, should have him attended by the family physician, all without cost to the donor.
In dealing with the question, whether the donation fell within the prohibition in question, this court, through Mr. Justice Simon, said:
“The terms of the law appear to throw a certain incapacity upon every citizen to dispose, and divest himself, of all his property, by donation inter vivos, and declares that such donation shall be null (not reducible) if he has not reserved to himself enough of his property for subsistence. The expression ‘reserve to himself’ cannot be understood to mean that he should rely upon others for his subsistence, but that he should himself keep in his possession and ownership a sufficient portion of his property to provide for his. subsistence. This seems to be the spirit of this law, as it would be vain to say that the mere promise of the donee to support the donor is a sufficient reserve, in the sense of article 1484 [now 1497], since the same obligation, without any contract on his part, is imposed on him by article 1547 [now 1560], which gives to the donor the right of revoking the donation, if the donee refuses him food, when in distress — lui refuse des alimens, lorsquil est dans le besoin.”
Thus, it is manifest that the lawmaker never intended that, on a simple stipulation of alimony, a man should divest himself of all his property “by donation inter vivos. He must keep a certain amount for his subsistence ; and we are confirmed in this opinion by article 1520 [now 1533] of the Civil Code, which does not permit that a donor shall reserve to himself the usufruct of the property given; and this is certainly more than a mere stipulation, or promise, of alimony on the part of the donee.”
A question then presented itself which, arises under those articles of the Code (cited supra), which provide that “the onerous donation is not a real donation if the value of the object given does not manifestly exceed that of the charges imposed on the donee”; that a “remunerative donation is not a real donation if the value of the services to be recompensed thereby, being- appreciated in *839 money, should be little inferior to that of the gift”; and that (article 1526):
‘‘In consequence, the rules peculiar to donations inter vivos do not apply to onerous and remunerative donations, except where the value of the object given exceeds by one half that of the charges or of the services.”
And the court said:
“With regard to the point that the donation under consideration was not gratuitous, but an onerous one, we think it untenable. Under article 1513 [now 1536], the value of the object given must exceed by one-half that of the charges ; and we agree with the judge a quo in the opinion that the annual rent and profits of the things donated, not to speak of their value as estimated in the contract, are clearly shown to be more than double the amount of the charges imposed upon the donee.”
The opinion quoted, therefore, first enunciates the doctrine that a man must “keep in his possession and ownership a sufficient portion of his property to provide for his subsistence,” and that the mere promise of another to support him does not meet that requirement. It, then, in effect, concedes (and it could hardly have done otherwise) that unless, in the case before it, the value of the property donated had exceeded by one-half the amount of the charges imposed on the donee, the conveyance would have been an onerous donation, and as such, under article 1513 (now 1526), would not have been subject to the prohibition contained in article 1484 (now 1497), or to any other rule ‘peculiar to donations inter vivos”; that is to say, peculiar to real, or gratuitous, donations.
Applying, then, to the instant case, the rule as stated and deduced from the opinion and judgment in Succession of Fox (supra) that, when the heirs of a decedent attack a conveyance, made by him as a remunerative or onerous donation, on the ground that the value of the property conveyed exceeds the disposable portion, or that the donor thereby divested himself of all his property, the burden of proof rests upon them to prove the fact relied on; and, applying, also, the rule, conceded in the case of Lagrange v. Barré (supra), that unless the value of the property conveyed by what purports to be a remunerative or onerous donation exceeds by one-half the value of the services intended to be compensated, or the charges imposed, the conveyance is not governed by the rules peculiar to (gratuitous) donations, and we find that plaintiffs’ suit, as here presented, has no legal foundation, since, having abandoned their allegation that defendant rendered no services to their grandmother, or that the services rendered were insignificant, they have failed to prove that she divested herself of all her property, or that the value of the property conveyed to defendant exceeded by one-half the value of the services rendered and of the charges imposed. For the reasons thus assigned:
It is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment rejecting the demands of the plaintiffs and dismissing this suit at their cost in both courts.